**ALDERWOODS (PENNSYLVANIA), INC., a wholly owned subsidiary of Service Corporation International, t/a Burton L. Hirsch Funeral Home, Appellant**

v.

**DUQUESNE LIGHT COMPANY, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 6, 2011.

Filed July 27, 2012.

Reargument Denied Sept. 27, 2012.

Alan J. Charkey, Philadelphia, for appellant.

Bradley S. Tupi, Pittsburgh, for appellee.

BEFORE: MUSMANNO, DONOHUE and COLVILLE*, JJ.

OPINION BY MUSMANNO, J.

Alderwoods (Pennsylvania), Inc., a wholly owned subsidiary of Service Corporation International, t/a Burton L. Hirsch Funeral Home ("Hirsch"), appeals from the Order entering summary judgment against it and in favor of Duquesne Light Company ("Duquesne Light"). We reverse and remand for trial.

The trial court summarized the facts underlying the instant appeal as follows:

The facts of this matter reflect that a motor vehicle accident occurred on Forward Avenue in the Squirrel Hill section of the City of Pittsburgh on January 8, 2009. The vehicle crashed into and broke a Duquesne Light utility pole, causing interruption of electrical service to numerous customers near the intersection of Forward Avenue and Murray Avenue, including [Hirsch]. Neighboring customers to [Hirsch] were also out of power as a result of this accident.

Duquesne Light received a call that the power was out in this area around 8:30 p.m. on January 9, 2009. A Duquesne Light crew was sent out to assess the situation and to make necessary repairs in order to restore service. Service was ultimately restored to that neighborhood. The last building to have its power restored was apparently [Hirsch's funeral home]. The old utility pole was removed and a new pole installed. Replacement equipment was also installed on this pole, including a three[-]phase transformer. Duquesne Light workers also connected a tri-plex, which consists of two energized (hot) wires and a neutral wire. The neutral conductor was correctly connected first, followed by the hot conductors. The procedure went smoothly, with no cause for concern for the crew. Restoration of power at a pole in this fashion is a typical job for Duquesne Light crews.

After making the connections at the pole, the Duquesne Light crew made the connections at the [Hirsch] building, first connecting the neutral conductor and then the energized conductors. These connections were made on the roof of [Hirsch] without any difficulty. After the connections were made, power to [Hirsch] was turned on and the workers came down from the roof of the building. Shortly thereafter, a fire began inside [Hirsch]. The fire originated in the basement in the electrical panel number 1.... [Hirsch] was locked at the time of the fire.

Trial Court Opinion, 3/8/11, at 2–3.

Hirsch subsequently filed a Complaint against Duquesne Light, followed by an Amended Complaint. Hirsch's Amended Complaint averred five counts against Duquesne Light: (1) Ordinary Negligence; (2) Negligence—Breach of Duty of Highest Degree of Care; (3) Negligence—*Res Ipsa Loquitur*; (4) Breach of Implied Duty of Hazard–Free Service; and (5) Breach of Implied Duty of Careful Repair. Amended Complaint at ¶¶ 13–33. At the close of discovery, Duquesne Light filed a Motion for Summary Judgment, which the trial court ultimately granted. Thereafter, Hirsch filed the instant timely appeal.

Hirsch presents eight claims for our review:

[1.] Whether [Duquesne Light] was entitled to summary judgment as to the implied warranty of hazard-free service, when under very similar circumstances, the Trial Court had previously held such a cause of action to exist[?]

* Retired Senior Judge assigned to Superior Court.

[2.] Whether the Trial Court erred by failing to follow the previous decision of a colleague on the same court[?]

[3.] Whether the Trial Court erred by failing to distinguish warranty from negligence in its Opinion[?]

[4.] Whether Pennsylvania's test for the existence of a duty indicated that [Duquesne Light] owed [Hirsch] a duty[?]

[5.] Whether [Duquesne Light], having previously litigated a nearly identical set of facts, was estopped to assert that the sequence of events leading to [Hirsch's] loss was not foreseeable[?]

[6.] Whether [Duquesne Light] was under a duty to prevent the events giving rise to [Hirsch's] damages, because the events were foreseeable, thereby precluding summary judgment[?]

[7.] Whether [Duquesne Light] was subject to the highest degree of care because it was in control of an inherently dangerous instrumentality[?]

[8.] Whether the Trial Court erred by citing to the non-binding, and unpersuasive, opinions of an administrative body[?]

Brief for Appellant at 4–5 (issues renumbered).

A party is entitled to summary judgment when they show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. *Atlantic States Ins. Co. v. Northeast Networking Sys., Inc.*, 893 A.2d 741, 745 (Pa.Super.2006). Such allegations may be supported by the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits. *Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 981 A.2d 145, 154 (2009). Our standard of review of the grant of summary judgment is as follows:

We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Daley v. A.W. Chesterton, Inc.*, 37 A.3d 1175, 1179 (Pa.2012) (citation omitted).

Hirsch's first two claims challenge the trial court's grant of summary judgment as to the counts of Hirsch's Amended Complaint averring breach of implied warranties. Hirsch first claims that the trial court erred in granting summary judgment because, in *Wivagg v. Duquesne Light Co.*, 73 D. & C.2d 694 (Allegheny Co.1975), the Allegheny County Court of Common Pleas confirmed the existence of such a cause of action for breach of implied warranty against an electric company. Brief for Appellant at 16. In conjunction with this claim, Hirsch asserts that the trial court misapplied a later decision of the Allegheny County Court of Common Pleas in *Bellotti v. Duquesne Light Co.*, 44 Pa. D. & C.3d 425 (Pa.Com.Pl.1987), as a basis for dismissing Hirsch's implied warranty counts. Brief for Appellant at 19.

Second, Hirsch claims that the trial court erred in not acknowledging or applying the decisions of the Allegheny County Court of Common Pleas in *Wivagg* and *Bellotti*, under the legal principle of *stare decisis*. *Id.* at 21. Basically, Hirsch claims that its case is indistinguishable

from the circumstances presented in *Wivagg* and accordingly, the trial court erred in deeming its breach of implied warranty claims legally insufficient. Upon review, we conclude that the decision of the common pleas court in *Wivagg* provides Hirsch with no basis for relief.[1]

In *Wivagg*, the plaintiff printing shop alleged that Duquesne Light had breached its implied warranties of merchantability and fitness to provide safe and hazard-free electrical service. *Wivagg*, 73 D. & C.2d at 695. The plaintiff presented evidence that outside of its business, "the high voltage primary lead wire running to the transformer was loose and swayed in the wind." *Id.* at 703. A Duquesne Light lineman corroborated this fact. *Id.* During a windstorm, the loose lead wire came into contact with the "secondary service drop cable." *Id.* at 704. Witnesses heard a popping sound, and observed the transformer smoking. *Id.* at 703. When the wires came into contact, a surge of high voltage flowed through the service drop into the plaintiff's printing shop. *Id.* at 704. The momentary surge "tripped the circuit breakers inside the shop; and upon disassembly, [the plaintiff's expert] found their contacts arced, indicating that they had interrupted short circuits." *Id.* "[T]he electrical system short-circuited, the insulation of the wires in the crawl space broke down, and a fire smoldered unnoticed...." *Id.*

In holding that an implied warranty of fitness for an intended purpose applied to Duquesne Light's sale of electricity to the printing shop, the trial court explained that "[i]t was the alleged contact of the high voltage primary lead with secondary service drop which plaintiffs claim brought about a surge of high voltage into the brick dwelling." *Id.* at 702. The court opined that "[b]y the nature of [Duquesne Light's] electrical service, plaintiffs were unable to protect themselves from this happening and were forced to rely upon [Duquesne Light's] skill and electrical apparatus for providing safe and hazard-free electrical power." *Id.* Thus, the common pleas court held that "[a]n implied warranty of safe and hazard-free electrical service arises from the supply of electricity by [a] defendant public utility." *Id.*

■ By contrast, Hirsch's breach of implied warranty claims in the instant case are based upon the actual repairs undertaken by Duquesne Light, not the initial surge of high-voltage electricity. Hirsch alleged in its Amended Complaint that "[i]n incorrectly and improperly reconnecting the Funeral Home's electrical system to Duquesne[ Light's] transmission and distribution system, Duquesne [Light] breached said implied warranty." Amended Complaint at ¶ 27. Hirsch also claimed that Duquesne Light impliedly had warranted that any repairs would be done "in a careful and workmanlike manner that would not cause any harm to Hirsch's property." *Id.* at ¶ 30. Hirsch's evidence, taken as true, does not support this claim.

Hirsch's own expert, Richard W. Wunderley, P.E. ("Wunderly"), opined that "[t]he improper connection hypothesis at the single phase mast head *was eliminated* after the evidence examination and further discovery information was received." Report at 6 (emphasis added). Hirsch presented no evidence that the repairs were done in a less than workmanlike manner, or that the connections were improperly made. Even if we recognized an implied warranty cause of action, Hirsch's evidence does not support the allegations of its Amended Complaint in this regard. Ac-

---

1. We additionally note that this Court is not bound by decisions of the common pleas courts. *Stoloff v. Neiman Marcus Group, Inc.,* 24 A.3d 366, 372 n. 5 (Pa.Super.2011).

cordingly, we discern no trial court error in the grant of summary judgment in favor of Duquesne Light on the implied warranty causes of action.

In its third claim of error, Hirsch argues that the trial court erred when it failed to distinguish Hirsch's breach of implied warranty counts from its counts alleging negligence. Brief for Appellant at 43. Quoting from the trial court's Opinion, Hirsch argues that the trial court "completely confused negligence and warranty." *Id.* While Hirsch is correct that the trial court improperly confused these legal theories, the trial court's error provides no basis for relief. As set forth above, we conclude that Hirsch is not entitled to relief on its causes of action asserting breach of an implied warranty.

Hirsch's remaining claims challenge the trial court's entry of summary judgment against Hirsch as to its negligence causes of action. Summarizing, Hirsch argues that (a) under Pennsylvania case law, Duquesne Light owed Hirsch a duty of care; (b) the events giving rise to Hirsch's damages were foreseeable; and (c) Duquesne Light owed Hirsch the highest degree of care because it was in control of an inherently dangerous instrumentality. *Id.* at 4–5.

In its Amended Complaint, Hirsch averred three negligence counts. Hirsch first averred ordinary negligence based on Duquesne Light's failure to adequately examine the funeral home's electrical system prior to restoring power; its failure to contact Hirsch requesting access to Hirsch's electrical system for examination prior to reconnection; its failure to instruct and supervise its employees in reconnecting electrical service; its non-adherence to accepted industry standards and practices; and Duquesne Light's failure to do those things which were necessary to preserve Hirsch's property and render said premises safe. Amended Complaint at ¶ 14. Hirsh additionally averred that Duquesne Light breached its duty of highest degree of care to avoid damage to Hirsch, as Hirsch is located near a high-voltage line. *Id.* at ¶¶ 17–18. Finally, Hirsch averred that

> [t]he creation of an electrical arc resulting in a catastrophic failure at a customer's electrical panel box upon an electric utility's reconnection of the customer's building to an electric utility's transmission and distribution system and/or upon the electric utility's re-establishment of the customer's electric service does not occur in the absence of negligence.

*Id.* at ¶ 21. In this regard, Hirsch asserted that Duquesne Light's negligent transmission and distribution system and/or negligent re-establishment of electrical service was within Duquesne Light's scope of duty to Hirsch. *Id.* at ¶ 23.

■ In addressing Hirsch's claims, we recognize that "a *prima facie* negligence claim requires the plaintiff to show that: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage." *Krentz v. CONRAIL,* 589 Pa. 576, 910 A.2d 20, 27 (2006). "Of these four elements, the primary one is whether the defendant owed a duty of care." *Althaus v. ex rel. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1168 (2000).

■ "The existence of a duty is a question of law for the court to decide." *R.W. v. Manzek,* 585 Pa. 335, 888 A.2d 740, 746 (2005). In determining whether the defendant owed a duty of care, we weigh the following five factors: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and

foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." *Althaus*, 756 A.2d at 1169; *accord Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 281 (2005). In applying the *Althaus* test, we remain cognizant that we are reviewing the entry of summary judgment. Accordingly, "[w]e view the record in the light most favorable to the non-moving party," and resolve all doubts as to the existence of a genuine issue of material fact "against the moving party." *Daley v. A.W. Chesterton, Inc.*, 37 A.3d at 1179.

■ As to the first factor of the *Althaus* test, Hirsch averred a relationship between itself, as the purchaser of electricity, and Duquesne Light, as the provider and transmitter of electricity. Amended Complaint at ¶¶ 4–7. Thus, this factor weighs in favor of imposing a duty upon Duquesne Light in this case.

Next, we examine the social utility of Duquesne Light's conduct, namely, transmitting electricity and facilitating its transmission. The sale and transmission of electricity have obvious social utility, as does the prompt restoration of power to customers after an outage. These factors would weigh in Duquesne Light's favor. However, Hirsch presented averments which, taken as true, establish that the restoration and transmission of electricity *in a safe manner*, following a high voltage surge into a customer's electrical panel, is of higher social utility, as it would have prevented the destruction caused by the resulting fire. *See id.* at ¶ 15 (Duquesne Light's negligence was the direct and proximate cause of the fire and damage to Hirsch's real and personal property), ¶ 21 (stating that the creation of an electrical arc resulting in a catastrophic failure at a customer's electrical panel box, upon the

reconnection of the customer's building to the electric utility's transmission and distribution system, or the reestablishment of electrical service normally does not occur in the absence of negligence); Wunderley Report at 3 (describing the damage to the electrical panel at Hirsch's funeral home), 6 (stating that "[v]isible electrical activity blew a hole through the [electric] panel cover and severely damaged the hot leg connection on the left side" and that the damage was consistent with an over voltage/over current condition), 7 (stating that Hirsch's electric system was an extension and integral part of the electric service supply from Duquesne Light to the funeral home and that an inspection prior to energizing the electric panel would have identified the damage to the panel and averted the fire). Weighing the social utility of Duquesne Light's prompt restoration of power against Hirsch's claim that Duquesne Light did not safely restore power to the funeral home, we conclude that this factor weighs slightly in favor of imposing a duty upon Duquesne Light.

■■ "Regarding the third factor, duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *R.W.*, 888 A.2d at 747. Hirsch argues that it was reasonably foreseeable that a high voltage surge would follow the contact of a high voltage power line with a low voltage line, and that Duquesne Light is estopped to argue otherwise. Brief for Appellant at 22. In support, Hirsch directs our attention to the facts presented in *Wivagg*, a case also involving Duquesne Light, wherein a high-voltage power line contacted low-voltage lines, shorting out the customer's electrical equipment and ultimately causing a fire. *Id.* at 22–23. Citing *Wivagg*, Hirsch contends that Duquesne Light had actual knowledge that when a primary line breaks loose and contacts low-voltage

lines, the customer's electrical equipment can be shorted out and compromised. *Id.* at 23. While we disagree with Hirsch's contention that the principles underlying the doctrine of collateral estoppel are applicable,[2] we agree that Hirsch has established the foreseeability of the harm alleged.

As set forth above, in *Wivagg*, a high voltage primary lead wire running to a transformer outside of the plaintiff's printing shop was loose and, during a windstorm, came into contact with a "secondary service drop cable[.]" *Wivagg*, 73 D. & C.2d at 703–04. This, in turn, sent a surge of high voltage through the service drop into the printing shop. *Id.* at 704. As a result of the surge, the circuit breakers tripped. *Id.* Disassembly revealed that the contacts had arced, "indicating that they had interrupted short circuits." *Id.* Thus, since the 1975 decision in *Wivagg*, Duquesne Light had knowledge that a short circuit may develop in a customer's electrical system as a result of a surge of high voltage, and that a surge may occur when a lead wire contacts a secondary service drop cable.

The Commonwealth Court addressed a similar scenario in *Poorbaugh v. Pennsylvania Pub. Util. Comm'n*, 666 A.2d 744 (Pa.Cmwlth.1995). In *Poorbaugh*, the plaintiff filed a civil complaint against West Penn Power Company in the court of common pleas. *Id.* at 745. The complaint alleged that Poorbaugh's barn was destroyed by fire caused by the negligence of West Penn Power Company. *Id.* The plaintiff asserted that during a storm, a West Penn subtransmission line and the distribution circuit came into contact with each other. *Id.* at 746. Following the creation of an overcurrent along the 12.5 kV distribution circuit, three protection/control devices (reclosers) failed. *Id.* Electricity going to Poorbaugh's farm was interrupted. *Id.* When West Penn restored power, Poorbaugh's equipment failed, resulting in an arcing of electricity, which led to a fire. *Id.* Although the Commonwealth Court was asked to rule upon a jurisdictional issue, the factual scenario demonstrates the foreseeability of the harm caused by an over current situation.[3]

In the instant case, Hirsch's expert, Wunderley, reported that "Duquesne Light personnel on site were aware of the potential for the 4000 volt primary conductors to come in contact with the secondary conductors due to the extensive damage to the pole." Wunderley Expert Report at 6. Wunderley opined that

> [t]he damage to the primary and secondary conductors on the pole on Forward Avenue coming in contact with each other would have resulted in the over voltage/over current condition and damage to the single phase electric panel in the funeral home.

*Id.* Further,

> [u]pon reenergizing panel #1 from the single phase service[,] the short circuit condition resulted in heating of the met-

---

**2.** The doctrine of collateral estoppel applies when the following four conditions are present: (1) the issue decided in a prior adjudication is identical to the one presented in the current action; (2) there was a final judgment on the merits in the prior action; (3) the party to the current action was a party or in privity with a party to the prior adjudication; and (4) the party against whom a claim of collateral estoppel is asserted had a full and fair oppor-

tunity to litigate the issue in question in the prior adjudication. *Daley,* 37 A.3d at 1190 n. 22.

**3.** The Commonwealth Court concluded that Poorbaugh's allegations against West Penn did not require a transfer from the court of common pleas to the Public Utility Commission. *Id.* at 751.

al panel box due to the short circuit current. The rapid heating due to the short circuit current ignited the wood backing the panel was mounted on.... *Id.*

Viewing the evidence in light most favorable to Hirsch, Hirsch has established that the nature of the risk and harm resulting from a power surge, following contact between the primary and secondary conductors, was reasonably foreseeable. Duquesne Light had actual knowledge that contact between the lines could ultimately short circuit Hirsch's electrical equipment and that the restoration of power under such circumstances could cause a fire. Accordingly, we conclude that the factor of foreseeability weighs in favor of imposing a duty upon Duquesne Light.

We next consider the consequences of imposing a duty upon Duquesne Light under the facts alleged by Hirsch. *See Manzek,* 888 A.2d at 747. Hirsch asserted Duquesne Light was negligent in, *inter alia,* not adequately examining the funeral home's electrical system prior to reconnection; failing to contact Hirsch prior to the reconnection to request access to the electrical system for an examination; failing to properly instruct its employees on the proper method for restoring power; and "failing and omitting to do those things which were necessary to preserve Hirsch's property and render said safe in the process of reconnecting the Funeral Home to the high-voltage line running along Forward Avenue." Amended Complaint at ¶ 18. Duquesne Light countered that it was under no duty and had no right to inspect a customer's electrical equipment prior to reconnecting power. Answer and New Matter to Amended Complaint at ¶ 18(b).

Duquesne Light presented evidence that it was not its practice to enter a customer's property and inspect the customer's equip-

ment before restoring power. Deposition (Donald Lewis) at 73. By contrast, Wunderley opined that "[i]nspection of the electric panels **and Duquesne Light metering equipment** in the funeral home prior to reenergizing the single phase service would have revealed the electrical damages...." Wunderley Expert Report at 7 (emphasis added). Duquesne Light's schedule of rates permits company employees to enter the property of a customer

> ... at all reasonable times for the purpose of reading Company meters, for inspection and repairs, for removal of Company property, *or for any other purpose incident to the service....*

Brief for Appellant at 28 (emphasis added) (quoting Wunderley Report at 5, in turn quoting Duquesne Light Schedule of Rates at Supplement No. 10, Second Revised Page No. 24).

The consequences of imposing a duty upon Duquesne Light to inspect, or at a minimum, to warn a customer, *under the facts alleged,* does not place an undue burden upon Duquesne Light. Here, the funeral home was "the only building [sic] electric services attached to the broken pole." Wunderley Expert Report at 2. Viewing the record in a light most favorable to Hirsch, this factor weighs in favor of imposing a duty upon Duquesne Light to warn the single affected customer (Hirsch), and to inspect at least its own equipment prior to restoring electrical service.

Finally, we weigh the public interest in imposing a duty upon Duquesne Light. *See Manzek,* 888 A.2d at 747. The public interest in restoring electrical service in a safe manner, so as to prevent a fire, is readily apparent. However, the prompt restoration of power is likewise in the public's interest. We conclude that this factor

does not tip the scales in favor of either party.

■ Hirsch argues that Duquesne Light breached its duty of the highest degree of care. Brief for Appellant at 41. Duquesne Light challenges Hirsch's assertion, directing our attention to Section 19 of its tariff on record with the Public Utility Commission ("PUC").[4] Section 19 provides, in relevant part, as follows:

*Continuity and Safety*

The Company will use all reasonable care to provide safe and continuous delivery of electricity but shall not be liable for any damages arising through interruption of the delivery of electricity or for injury to persons or property resulting from the use of the electricity delivered.

Brief for Appellee at 5 (quoting Duquesne Light Schedule or Rates). Duquesne Light argues that the liability protection afforded by Section 19 is effective "as long as Duquesne Light exercises reasonable care in providing safe and continuous service." Brief for Appellee at 6.

In *Stewart v. Motts*, 539 Pa. 596, 654 A.2d 535 (1995), our Supreme Court explained that "negligence is absence or want of care under the circumstances." *Id.* at 538 (citation omitted). Our Supreme Court had held previously that

[the fact that] a transmission line is a dangerous instrumentality is recognized everywhere. No matter where located it is a source of grave peril and the law requires that the possessor of such an instrumentality exercise a high degree

of care: "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question."

*Yoffee v. Pennsylvania Power & Light Co.,* 385 Pa. 520, 123 A.2d 636, 645 (1956) (quoting *MacDougall v. Penna. Power & Light Co.,* 311 Pa. 387, 166 A. 589, 592 (1933)).

Since its decision in *Yoffee*, our Supreme Court has explained that, when it referred to a "higher degree of care,"

we were not creating a second tier of "extraordinary care" over and above ordinary or reasonable care. Instead, we were simply recognizing the general principle that under the reasonable care standard, the level of care must be proportionate to the danger involved. Our use of the language "higher degree of care" merely stated the common sense conclusion that the use of a dangerous agency would require the reasonably prudent person to exercise more care. In fact these cases rejected any formalistic higher standard of care in holding that "no absolute standard of care [could] be fixed by law."

*Stewart*, 654 A.2d at 538. Thus, "this Commonwealth recognizes only one standard of care in negligence actions involving dangerous instrumentalities—the standard of reasonable care under the circumstances." *Id.* at 539.

---

4. The Public Utility Law empowers the PUC to control the provision of public utilities in the best interests of the public. 66 Pa.C.S.A. § 501. The law allows utilities to develop tariffs that define the rules and regulations surrounding the provision of services to subscribers. *Id.* § 1501. The Public Utility Code defines "tariff" as "all schedules of rates, all

rules, regulations, practices or contracts involving any rate or rates." *Id.* § 102. "Tariffs filed with a state regulatory agency, such as the PUC, are not mere contracts but have the force of law and are binding on the consumer and the utility." *Stiteler v. Bell Tel. Co.,* 32 Pa.Cmwlth. 319, 379 A.2d 339, 341 (1977).

It is well established by our case law that the reasonable man must exercise care in proportion to the danger involved in his act. Thus, when a reasonable man is presented with circumstances involving the use of dangerous instrumentalities, he must necessarily exercise a "higher" degree of care proportionate to the danger. Our case law has long recognized this common sense proposition that a reasonable man under the circumstances will exert a "higher" degree of care when handling dangerous agencies. Although no absolute standard can be fixed by law, [ ] every reasonable precaution suggested by experience and the known danger ought to be taken.

*Id.* at 539–40 (citations and quotation marks omitted). Duquesne Light's tariff requires the utility company to use "all reasonable care to provide safe and continuous delivery of electricity[.]" Brief for Appellee at 5 (quoting Duquesne Light Schedule or Rates). Thus, the tariff is not inconsistent with the standard of care set forth in *Stewart.* Hirsch's negligence cause of action avers that Duquesne Light breached its duty of care when it restored electricity to the funeral home without first contacting Hirsch and, at a minimum, inspecting its own equipment. Accordingly, Hirsch's cause of action is not barred by Section 19 of Duquesne Light's tariff.

Weighing the factors set forth in *Althaus,* in accordance with our standard of review, we conclude that the trial court erred in entering summary judgment against Hirsch as to its causes of action sounding in negligence. Hirsch has presented evidence which, taken as true, establishes that Duquesne Light owed a duty to Hirsch; Duquesne Light breached its duty of care under the circumstances presented; and that Duquesne Light's breach of its duty caused damages to Hirsch. On this basis, we reverse the Order of the trial court, which entered summary judgment in favor of Duquesne Light, and remand for further proceedings.

Order reversed; case remanded for further proceedings consistent with this Opinion; Superior Court jurisdiction relinquished.