**[J-78-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


ALDERWOODS (PENNSYLVANIA), INC., : No. 12 WAP 2013
A WHOLLY OWNED SUBSIDARY OF :
SERVICE CORPORATION : Appeal from the Order of the Superior
INTERNATIONAL, T/A BURTON L. : Court entered July 27, 2012 at No. 1967
HIRSCH FUNERAL HOME, : WDA 2010, reversing the Order of the
: Court of Common Pleas of Allegheny
          Appellee : County entered December 13, 2010 at No.
: GD-09-14720 and remanding.
:
          v. : ARGUED: October 15, 2013
:
:
:
DUQUESNE LIGHT COMPANY, :
:
          Appellant :


**DISSENTING OPINION**


**MR. JUSTICE EAKIN**                    **DECEMBER 15, 2014**

      As I find the duty created by the Superior Court contravenes precedent from this

Court — a duty that is unsupported by the allegations in appellee's complaint — I cannot

join the majority in affirming that decision.

      It has long been the law in Pennsylvania that an electric service provider is neither

obligated to inspect its customers' equipment nor liable for damages relating thereto.

See Milton Weaving Co. v. Northumberland County Gas & Electric Co., 96 A. 135, 136-37

(Pa. 1915); see also Adams v. United Light, Heat & Power Co., 69 Pa. Super. 478

(1918).[1]  Thus, while an electric utility must inspect its own equipment for defects or

---

[1] Interestingly, the majority suggests Adams supports its holding — despite the fact that
Adams reaffirmed Milton — because the court commented in dictum that it "may be" that
(continued…)

damage, its obligations end at the "service point," i.e., where the lines connect to the customer's wiring system.

Notwithstanding this well-established rule, the Superior Court found Duquesne Light had a duty to warn appellee of a possible dangerous condition with appellee's equipment. The majority affirms the Superior Court's holding, despite reaffirming that "maintenance and inspection responsibilities generally are divided at the service point, such that an electric service provider does not have a freestanding duty to inspect customer-owned electrical equipment and services on the premises' side." Id., at 17 (citation omitted). Apparently, the majority finds the service-point rule inapplicable based on the allegation that Duquesne Light had constructive knowledge of an unreasonable risk of harm. See id., at 18. However, if an electric service provider's obligations end at the service point, then Duquesne Light owed appellee no duty to intuit hazards manifesting on appellee's side of that point. Whether couched as a duty to inspect, as appellee alleges, or the Superior Court's admittedly more "modest" duty to warn, any basis for liability stemming from the customer's own equipment runs afoul of the bright-line rule established by Milton.

---

(…continued)
an electric company should be liable if it furnishes electricity with knowledge of a defect in the wiring of a building. Majority Slip Op., at 18 n.11. The majority appears to couch this comment as a declaration by the Superior Court that its opinion (and, somehow, "implicitly," this Court's opinion in Milton) should not be read to preclude liability stemming from the "duty in issue" — presumably, the duty at issue in this case. However, we are not dealing here with the duty that accompanies actual knowledge of a defect in the customer's equipment — appellee did not plead actual knowledge in either complaint, and I have found no evidence of such knowledge in the record. Rather, appellee's claim is that Duquesne Light knew of a risk of harm that could be posed by reenergizing the system if an overcurrent condition had caused appellee's electric panel to fail, i.e., it should have known of a dangerous condition inside the building. Respectfully, this case is far removed from the scenario the Adams court conjectured "may" give rise to liability.

To its credit, the Superior Court attempted to limit its holding to the peculiar facts of this case. Not only did it conduct an Althaus[2] analysis specific to these two parties, but within that analysis, it made clear that "[t]he consequences of imposing a duty upon Duquesne Light to inspect, or at a minimum, to warn a customer, under the facts alleged, does not place an undue burden upon Duquesne Light[,]" noting the funeral home was "'the only building … attached to the broken pole.'" Alderwoods (Pennsylvania), Inc. v. Duquesne Light Company, 52 A.3d 347, 355 (Pa. Super. 2012) (emphasis in original). The majority, however, broadens the scope of the intermediate appellate court's holding to include all electric service providers. See Majority Slip Op., at 25 (imposing duty on electric service providers to take reasonable measures to avert harm where they have actual or constructive knowledge of dangerous condition impacting customer's electrical system caused by fallen power lines near property). There is also the problem that this new duty is not confined to single-pole situations, but applies when entire blocks of customers await return of service. I find this new duty not only unwise and generally unworkable, but also unwarranted, given appellee's failure to plead facts to support the newly created "failure to warn" theory, discussed infra.

The majority holds that electric service providers must "take reasonable measures to avert harm" when they have reason to know of a dangerous condition affecting the customer's electrical system. Id. While the majority appears to limit this obligation to a duty to warn, see id., at 17-18, it fails to outline the peripheries of this new duty. To be sure, "reasonableness" is the standard by which allegedly negligent actions are judged, but it remains a duty ill-defined as it relates to the myriad situations electric service companies will face.

---

[2] Althaus v. Cohen, 756 A.2d 1166 (Pa. 2000).

Some situations provide actual knowledge of a problem, but others do not. How is an electric company to know what are "reasonable measures to avert harm" when the problem is on property it does not control? The majority suggests Duquesne Light should have notified appellee so appellee could summon its own electrician, which is fine as far as it goes — but after it does so, must the company delay returning service to others until the customer finds and hires an electrician? Must the utility wait even longer while the electrician conducts the inspection before it reenergizes the system? The majority appears to assume every customer will receive the warning and immediately respond, but the delays inherent in these situations, shared by all affected customers, should not be exacerbated by placing the problems of each landowner in the lap of the utility. What if an affected customer cannot be reached at all? At what point is it reasonable for the utility to restore power to all despite the flaws in a customer's own equipment?

As the majority points out, "these are precisely the sorts of considerations relegated to juries[,]" id., at 25, and perhaps a body of law will, eventually, develop on this new duty, as its ramifications are exposed by new cases. In the meantime, however, these uncertainties will result in significant delays in the restoration of power because if the electric service companies know they may be held liable for damages if they restore power prematurely, they will delay doing so until they are sure no such damage will occur. Depending on the severity and location of the storm that caused it, weather-related power outages impact thousands of customers, commercial and residential alike, in both urban and rural areas. While the outage here was relatively benign, as appellee was the only one connected to the affected pole, the new duty created is not limited to such situations — it must be applicable to all, and in most circumstances, a prolonged power outage would be not only a public inconvenience, but also a major safety concern.

In addition to these substantive objections, I must also disagree with the majority's decision on procedural grounds. As noted above, the "duty to warn" theory was not advanced by appellee. In the Superior Court, appellee did not argue Duquesne Light breached its duty to notify it of a potential hazard, instead arguing the trial court "should have concluded that Duquesne [Light] was under a duty to inspect [appellee]'s electrical apparatus before restoring power." Appellee's Superior Court Brief, at 41. Rather than confine its analysis to the theories proffered by the parties, the Superior Court sua sponte addressed a duty to warn appellee of possible dangers created by appellee's own equipment. In doing so, the court erred.

"[C]ourts should not recast a pleading in a way not intended by the parties." Steiner v. Markel, 968 A.2d 1253, 1260 (Pa. 2009). "[W]hen a court decides issues sua sponte, it exceeds its proper appellate function and unnecessarily disturbs the processes of orderly judicial decisionmaking." Id. (citation omitted). The Superior Court ran afoul of these well-established principles of appellate review, and the majority does not account for this error.

Not only did the court err in addressing an issue not raised by the parties on appeal, but it reversed the trial court, in part, based on a theory that cannot be gleaned from appellee's pleadings. In its amended complaint, appellee claimed Duquesne Light was negligent for three things:

(1) improperly reconnecting the lines between the funeral home and the distribution system;

(2) failing to inspect the system; and

(3) "failing and omitting to do those things which were necessary to preserve Hirsch's property and render said premises safe."

Amended Complaint, 5/28/10, at 4. Nowhere did appellee allege Duquesne Light was negligent for failing to warn the funeral home employees of a dangerous condition prior to reenergizing the system.[3] Moreover, if Duquesne Light's failure to warn appellee of a potential hazard is the basis for its negligence claim, it must allege and prove the failure to warn caused the harm it suffered, i.e., that had it been notified, appellee would have inspected and remedied the defect prior to the company's reenergizing the system. Appellee's pleadings contained no such allegation.[4]

Both the Superior Court and the majority fail to clearly specify where they find support in appellee's pleadings for a cause of action against Duquesne Light for failing to warn it of a potentially dangerous condition manifesting in its panel box. Presumably, appellee's "failure to warn" claim is found embedded within its catchall allegation that Duquesne Light failed "to do those things which were necessary to preserve Hirsch's property and render said premises safe." Amended Complaint, 5/28/10, at 4. Since none of appellee's allegations relate to Duquesne Light's failure to warn, one must conclude this catchall allegation constitutes the gravamen of a negligence claim and sufficiently pleads the requisite elements of duty, breach, and causation. I know of no

---

[3] In fact, the majority acknowledges as much. See Majority Slip Op., at 21 n.14 ("Hirsch did not specifically focus its pleadings and submissions in the common pleas court on warnings[.]").

[4] Appellee's expert did opine that "[n]otification to the funeral home by Duquesne Light would have resulted in a quick response from the funeral home employees[,]" noting the utility had appellee's contact information and appellee had an answering service for after-hours calls. Engineering Report, 8/23/10, at 7. Why these statements were included in an engineering report is unclear; moreover, power was restored at 3:00 a.m., and the expert makes no attempt to clarify when this "quick response" would have occurred. In any event, the report is not part of the amended complaint, and the statements therein were made in the context of Duquesne Light's failure to contact appellee to gain access so Duquesne Light could fulfill a duty to inspect, not a failure to notify appellee of a potential hazard.

authority that would allow such a vague averment to serve as the factual predicate for establishing three of the four elements required for a legitimate negligence action.[5]

Accordingly, I dissent.

---

[5] Surely, in order to present evidence on Duquesne Light's failure to notify appellee of the alleged danger and how appellee would have responded to such a warning, appellee would need to amend its complaint to include factual averments pertaining to these issues. See, e.g., Levin v. Van Horn, 194 A.2d 419, 422 (Pa. 1963) (finding general allegation charging nursing home staff with "fail[ing] to give proper, timely and adequate nursing care and attention" insufficient to allow evidence of a specific failure to notice symptoms of over-medication). However, as the majority notes, "[appellee] has not sought to amend the complaint although it has pursued a substituted theory of liability resting on different factual premises." Majority Slip Op., at 21 n.14. I find it troubling for an appellate court to adopt an unpresented theory of liability and remand with implicit instructions for the plaintiff to amend its complaint so it can pursue the theory the court devised on its behalf.