**[J-78-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**


| | |
|---|---|
| ALDERWOODS (PENNSYLVANIA), INC., A WHOLLY OWNED SUBSIDIARY OF SERVICE CORPORATION INTERNATIONAL, T/A BURTON L. HIRSCH FUNERAL HOME, <br><br> Appellee <br><br> v. <br><br> DUQUESNE LIGHT COMPANY, <br><br> Appellant | : No. 12 WAP 2013 <br> : <br> : Appeal from the Order of the Superior <br> : Court entered July 27, 2012 at No. 1967 <br> : WDA 2010, reversing the Order of the <br> : Court of Common Pleas of Allegheny <br> : County entered December 13, 2010 at No. <br> : GD-09-14720 and remanding. <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> ARGUED:  October 15, 2013 |


**OPINION**


**MR. JUSTICE SAYLOR**                    **DECIDED:  DECEMBER 15, 2014**


The main and controlling issue accepted for review, as framed by the appellant, is "[w]hether the Superior Court erred in imposing upon electric utilities a burdensome and unprecedented duty to enter customers' premises and inspect customers' electrical facilities before restoring power after an outage?"  Alderwoods (Pa.), Inc. v. Duquesne Light Co., 620 Pa. 214, 66 A.3d 763 (2013) (per curiam).  It is material to bear in mind from the outset, however, that the appellant's portrayal of the issues fails to adequately address the Superior Court's formulation of electric-company duties, in the alternative, "to inspect, <u>or at a minimum, to warn a customer</u>, under the facts alleged[.]"

Alderwoods (Pa.), Inc. v. Duquesne Light Co., 52 A.3d 347, 355 (Pa. Super. 2012) (emphasis adjusted)).

## I. Background

Appellant, Duquesne Light Company ("Duquesne Light" or "Duquesne"), is a Pennsylvania public utility engaged in the business of transmitting and distributing electric power in the city of Pittsburgh. Appellee, Alderwoods (Pennsylvania), Inc., trading as Burton L. Hirsch Funeral Home ("Hirsch"), conducted business at 2704 Murray Avenue in Pittsburgh. The electric company provided service to Hirsch at this location.

On Friday, January 9, 2009, after business hours, an unidentified motor vehicle crashed into and felled a utility pole carrying electric lines owned and operated by Duquesne Light. Several wires were connected to Hirsh's business premises, and at least one was stripped from the service point, i.e., the attachment point to the building's electrical system located on the structure. In addition to the funeral home, a number of other local buildings lost power as a result of the incident, although no structure other than Hirsh's was connected directly to the downed pole.

Upon receiving word of the outage, Duquesne Light dispatched a line crew to make repairs. Over a period of several hours (about twelve, in Hirsch's estimation), linemen replaced the pole, installed new transformers, and restored power to the buildings. Finishing with the locked, unoccupied funeral home, crew members climbed onto the roof to connect the new external wiring to the building's electrical system at the service point.

Soon after the wires were connected and energized, a fire broke out at the location of an electrical panel box located in the basement of the premises and owned by Hirsch. The blaze spread, and the funeral home was destroyed.

Hirsch commenced a civil action against Duquesne Light, including two negligence counts, denominated "ordinary negligence" and "highest degree of care" attendant to the supply of electricity.[1] According to Hirsh's pleadings, the electric company's employees "incorrectly and improperly" reconnected the funeral home to the transmission and distribution system. Amended Complaint at ¶11. Hirsh contended that this triggered an electrical arc and catastrophic failure at the electrical panel box inside the funeral home, resulting in the fire. See id. at ¶12. The amended complaint also charged the utility with nonfeasance for not examining the funeral home's electrical system or contacting Hirsh to request access for inspection prior to restoring power, and, more generally, for failing to do those things necessary to maintain safety and preserve the business premises. See id. at ¶14.

In an answer with new matter, Duquesne denied a number of the material allegations of the complaint and asserted that the fire was a result of the malfeasance of the unknown third-party motorist and/or defective electrical wiring or equipment owned and maintained by Hirsch. The electric company also indicated that it bore no duty to inspect the funeral home's -- or any other customer's -- privately-owned electrical equipment or system before restoring power after an outage. See Answer and New Matter to Amended Complaint at ¶43.

In discovery, Hirsch tendered the report of an electrical engineer, Richard W. Wunderley, P.E., who had been retained to render an opinion concerning Duquesne Light's role in the events giving rise to the funeral home's destruction. In his analysis, the engineer initially dismissed the hypothesis that the electric company's line crew had misconnected wires when restoring power. See Engineer's Report, EFI Global, dated

_____

[1] Although Hirsch included other counts in its pleadings, our treatment in the present appeal is limited to this negligence-based aspect of the litigation.

August 23, 2010, at 6 ("The improper connection hypothesis at the single phase mast head was eliminated after the evidence examination and further discovery information was received."). Mr. Wunderley advanced another theory, however. He posited that, during the downing of the utility pole, a primary line consisting of wires (or conductors) carrying high-voltage electricity from a substation had contacted stepped-down secondary lines transmitting lower-voltage current to the funeral home, causing an "over voltage/over current condition" in the electrical system interior to the funeral home and touching off a short-circuit. Id. at 6. The engineer indicated that Duquesne Light's subsequent reenergizing of the damaged electrical system heated the metal panel box to an extreme temperature, igniting the attached wood backing. See id. at 2, 6.

According to Mr. Wunderley, "[i]nspection of the electric panels and Duquesne Light metering equipment in the funeral home prior to reenergizing the single phase service would have revealed the electrical damage caused by the contact between the primary and secondary conductors at the pole[.]" Id. at 7. Furthermore, Mr. Wunderley asserted that the extensive damage to the utility pole and lines at the crash site afforded Duquesne's line crew ample notice of a substantial likelihood that the high-voltage primary conductors contacted the lower-voltage secondary lines. See id. at 7 ("The potential for damage inside the funeral home due to the physical damage to the service connections and probable contact between the 4000 volt primary and secondary conductors was a compelling reason and cause to inspect the metering equipment in the funeral home prior to reenergizing the single phase service." (emphasis added)); Engineer's Supplemental Report, EFI Global, dated August 31, 2010, at 3 (referencing the conditions outside Hirsch's premises as presenting "strong/compelling evidence . . . that should have caused Duquesne Light to inspect the electrical system in the funeral home prior to reenergizing the electric service." (emphasis added)). Moreover, had an

inspection been undertaken prior to restoration of power, the engineer stated, the damage to the electrical panel would have been discovered and the fire averted. See Engineer's Report, EFI Global, dated August 23, 2010, at 7-8 ("Because Duquesne Light failed to inspect the electrical system, . . . the above events/conditions resulted in a catastrophic failure and fire.").

At the close of discovery, Duquesne Light pursued summary judgment. The electric company rested its motion squarely on the premise that "[t]he only basis asserted for liability is that before restoring power, the Duquesne Light crew should have entered the locked Funeral Home in the middle of the night, gone to the basement, and inspected the customer's electrical panel." Brief in Support of Summary Judgment at 4 (emphasis added). The company then set about disclaiming any such duty, on the part of an electric service provider, to affirmatively inspect privately-owned equipment and/or systems prior to restoring power after an outage.[2]

Early on in its supporting brief, Duquesne Light observed the axiom that duty is an essential element of a negligence claim. See, e.g., Althaus ex rel. Althaus v. Cohen, 562 Pa. 547, 552, 756 A.2d 1166, 1168 (2000). The electric company's essential position was that the service point establishes a firm line of demarcation between the responsibilities of an electric service provider and the customer -- if a failure occurs on

---

[2] In its motion, Duquesne Light also noted that Hirsch's pleadings were premised upon the assertion that the utility's line crew performed its work incorrectly on the outside of the building; whereas, Hirsh's expert had subsequently conceded that this simply was not the case. See Motion for Summary Judgment in Alderwoods at ¶¶15-16. Appeal was not allowed, however, to consider the appropriateness of summary judgment relative to variances between Hirsch's pleadings and proffers. See Alderwoods (Pa.), Inc. v. Duquesne Light Co., 620 Pa. 214, 66 A.3d 763 (2013) (per curiam) (centering the allowance of appeal on the presence or absence of a relevant duty on Duquesne Light's part). Accordingly, we offer no assessment of the sufficiency of Hirsch's pleadings in laying a sufficient factual foundation for Mr. Wunderley's opinion.

the utility's side, it may bear responsibility, and certainly the company has the obligation to make reasonable inspections of its own equipment up to the service point. But if any failure occurs on the customer side, Duquesne asserted, it can be the customer's -- and only the customer's -- responsibility, and under no circumstances is an electric service provider obliged to inspect private electrical systems internal to serviced premises.

In support of this position, Duquesne Light relied prominently upon Milton Weaving Co. v. Northumberland County Gas & Electric Co., 251 Pa. 79, 83, 96 A. 135, 136 (1915) (following "the view that [an electric service provider] is not bound to inspect such appliances [owned and maintained by its customers] and is not generally liable for injuries or damages caused by reason of defect therein"); and Adams v. United Light, Heat & Power Co., 69 Pa. Super. 478, 1918 WL 2272 (1918) (applying the general rule articulated in Milton in support of a determination that an electric service provider had no duty associated with personal injury caused by a defective electrical extension cord inside a customer's premises).[3] The electric company asserted that these cases and others in their line exemplified, in the application, a bright-line allocation of responsibility from the service point between an electric service provider and any customer.

---

[3] Duquesne Light also quoted an opinion of the Pennsylvania Public Utility Commission (the "PUC" or the "Commission"), as follows:

> Traditionally, utilities, the [PUC], and the Courts have recognized that the ownership and maintenance responsibility of an electric utility ends at the point of delivery to the customer. . . . From that point on, the customer owns and assumes the responsibility for the maintenance and security of the internal wiring.

Brief in Support of Summary Judgment at 6 (quoting Hineline v. Metro. Edison Co., No. C-902777, 1990 Pa. PUC LEXIS 156, at *6 (Pa. PUC Oct. 5, 1990)).

Further, Duquesne Light presented policy arguments supporting this demarcation, including the following:

> It makes perfect sense for tort law to impose a duty upon a utility to install, inspect and maintain its own equipment in a safe condition. It makes no sense to extend the utility's duty to the customer's equipment. If Duquesne Light were to be required to enter the Funeral Home and inspect electrical facilities before restoring power, which items of equipment should it inspect? The panel box only? What about fuses and circuit breakers? Should Duquesne Light take the cover off the panel box and check the connections in the back? What about the wires carrying power throughout the building? What about the toaster in the kitchen? Once the line of demarcation between the utility's equipment and the customer's equipment is crossed, there is no logical limit to the utility's potential responsibility. Sensibly, Pennsylvania law has never imposed such unlimited liability on an electrical utility.
>
> *          *          *
>
> It would be impractical to require Duquesne Light, or any other utility, to enter and inspect . . .. Such a requirement would complicate and delay power restoration after storms and other outages. A number of [local] customers, not just the Funeral Home, were affected by the motor vehicle accident. Duquesne Light did not inspect those customers' electrical infrastructure prior to reapplying power, nor was the Company under any legal duty to do so.

Brief in Support of Summary Judgment at 5-7.

In response to the summary judgment motion, Hirsch relied on general negligence principles as establishing a duty to avert harm when one engages in conduct which foreseeably creates an unreasonable risk to others. See Memorandum of Law in Opposition to Summary Judgment at 15 (quoting Commerce Bank/Pa. v. First Union Nat'l Bank, 911 A.2d 133, 139 (Pa. Super. 2006)). See generally Restatement (Second) of Torts §302 cmt. a (1965) ("In general, anyone who does an affirmative act

is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act."). To evidence notice, on Duquesne Light's part, of a dangerous condition within the funeral home, Hirsch referenced the circumstances which, in Mr. Wunderley's opinion, generated a "compelling reason" to inspect the meters inside the premises. Engineer's Report, EFI Global, dated August 23, 2010, at 7. These included the downed, broken high-voltage lines with which the electric company's work crew was confronted, as well as a tripped circuit breaker at a substation connected to the pole's transformer, indicative of a power surge. See Response in Opposition to Motion for Summary Judgment at ¶¶5, 11 (citing Deposition of Joseph G. Frankhauser dated March 31, 2010, at 27, and Deposition of Donald Lewis dated April 29, 2010, at 20-25, 53-56).

As to duty, Hirsch eschewed Duquesne Light's vision of a rigid line of demarcation between the responsibilities of an electric company and the customer. According to Hirsch, none of the cases relied upon by the electric company involved circumstances in which an electric service provider should have foreseen the sequence of events causing harm. In light of the circumstances known to the utility's line crew when members restored power to the funeral home, Hirsch argued that damage to the building's electrical system was eminently foreseeable to them. Along these lines, the funeral business owner stressed that Duquesne was a litigant in a prior case involving a line-crossing, overvoltage scenario. See Wivagg v. Duquesne Light Co., 73 Pa. D.&C.2d 694 (C.P. Allegheny 1975). In response to Duquesne's protestations about entering customer premises, Hirsch highlighted a passage from the "Duquesne Light Schedule of Rates and Service Installation Rules" indicating that utility representatives have a right of access to customer premises to read meters, for inspection and repairs, and for any other purposes incident to service. See, e.g., Appendix to Response in

Opposition to Motion for Summary Judgment at Ex. I, Supplement No. 10, Second Revised Page No. 24.

Finally, Hirsch invoked a series of factors delineated in this Court's seminal decision in Althaus ex rel. Althaus v. Cohen, 562 Pa. 547, 756 A.2d 1166 (2000), relevant to whether the common law should impose duties not previously recognized.[4] These factors are: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." Id. at 553, 756 A.2d at 1169. In this regard, Hirsh highlighted that it and Duquesne Lighting maintained a business relationship beneficial to both parties, acknowledged the high social utility of electric service, stressed its proffer that the risk of an overvoltage scenario is foreseeable (including the expert report of Mr. Wunderley), alluded to the catastrophic consequences of an uncontrolled fire, indicated that the burden of conducting an electrical inspection is modest in comparison to the harm, and urged that the overall public interest in terms of the preservation of lives and property would be advanced by recognition of an affirmative duty to inspect. See Memorandum of Law in Opposition to Motion for Summary Judgment at 17-21.

Upon consideration of the litigants' submissions, the common pleas court awarded summary judgment in Duquesne Light's favor. See Alderwoods (Pa.), Inc. v. Duquesne Light Co., No. G.D. 09-14720, slip op. (C.P. Allegheny March 8, 2011). In a brief opinion, the court credited the utility's theory that, while an electric company has a

---

[4] In the negligence arena, in the absence of a relevant statute, the determination whether to impose affirmative common-law duties as a predicate to civil liability is a matter of law. See Seebold v. Prison Health Servs., Inc., 618 Pa. 632, 650, 57 A.3d 1232, 1243 (2012).

duty to maintain its own equipment and conduct reasonable inspections of its own facilities, it has no duty to inspect equipment owned by its customers. In this regard, the common pleas court found the Superior Court's decision in Adams to be controlling and the PUC's remarks in Hineline to be persuasive. See id. at 4-6; see also supra note 3.

On appeal, the Superior Court reversed in the relevant regard. See Alderwoods, 52 A.3d 347. After setting forth the standards governing an award of summary judgment and ensuing appellate review,[5] the court undertook an Althaus analysis on terms similar to those advocated by Hirsch in opposition to summary judgment. The intermediate court, in essence, concluded that Hirsch established a prima facie case that Duquesne Light was on constructive notice of the damage to the funeral home's electrical system and of the attendant risk of fire. See id. at 355. In such circumstances, the court reasoned, an electric company bears a duty to take reasonable measures to avert the harm. See id. at 357.[6]

---

[5] A court of original jurisdiction may grant summary judgment only when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. See, e.g., Smith v. Twp. of Richmond, ___ Pa. ___, ___, 82 A.3d 407, 414-15 (2013). The appellate court views the record in the light most favorable to the non-moving party and considers whether an error of law or abuse of discretion has occurred. See, e.g., id. at 415.

Parenthetically, the questions of whether there are material facts in issue and whether the moving party is entitled to summary judgment are matters of law. Accord Pyeritz v. Commonwealth, 613 Pa. 80, 88, 32 A.3d 687, 692 (2011) (delineating the applicable review standard only in terms of the legal-error component). The abuse-of-discretion aspect has relevance only with regard to matters which lie within the discretion of the court of original jurisdiction, such as a subsidiary evidentiary ruling associated with the award.

[6] Citing Stewart v. Motts, 539 Pa. 596, 654 A.2d 535 (1995), the Superior Court also correctly explained that there was no substantive difference between Hirsch's "ordinary negligence" and "highest degree of care" negligence counts, since the care to be exercised in any given case is proportionate to the seriousness of the consequences. (continued…)

The Superior Court, however, shied from recognizing such duty in terms of one to inspect customer equipment, which was the subject of the underlying summary judgment proceedings. Rather, the intermediate court repeatedly noted that the formulation of duty in the complaint included a catch-all, namely, an obligation "to do those things which were necessary to preserve Hirsch's property and render [the funeral home] safe in the process of reconnecting [it] to the high-voltage line[.]" Alderwoods, 52 A.3d at 355 (quoting Amended Complaint at ¶18). The court then formulated the relevant duty in terms of an obligation "to warn the single affected customer (Hirsch), and to inspect at least its own equipment prior to restoring electrical service." Id. (also describing Duquesne Light's obligation as "to inspect, or at a minimum, to warn a customer, under the facts alleged" (emphasis adjusted)). This reference in respect to Duquesne Light's "own equipment" was to the utility-owned electric meters in the basement of the funeral home.[7]

## II. Arguments

In its main brief, Duquesne Light concentrates closely on the position that electric service providers have no obligation to inspect privately-owned electrical equipment and systems internal to customer premises, as a corollary to the service-point rule. Consistent with this focus, the electric company portrays the Superior Court's opinion

---

(…continued)
See id. at 605, 654 A.2d at 539. In this regard, the intermediate court observed that electricity is universally recognized to be a dangerous instrumentality, thus implicating a high degree of care on a utility's part, see Alderwoods, 52 A.3d at 356-57, at least within the sphere of conventional duties.

[7] Although the meters apparently did not manifest any damage which would suggest an electrical surge, the Superior Court appears to have relied upon Hirsch's proffer that the meters were close to the relevant electrical panel, so that inspection of the former would have revealed the damage to the latter. See id.

only as holding that the utility "had a duty to enter and inspect," Brief for Appellant at 7, despite that the intermediate court actually framed the duty in the alternative to encompass a more modest option to warn.  See Alderwoods, 52 A.3d at 355.[8]

Having so framed the issue, Duquesne Light advances its argumentation in much the same fashion as it has from the outset in its summary judgment motion and supporting  brief.  In this vein, the company remonstrates that there simply is no judicial precedent to support an affirmative duty to inspect.  According to the utility, the intermediate court "sidestepp[ed] a century of precedent" by discarding the essential service-point rule.  Brief for Appellant at 7-10 (citing, inter alia, Milton, 251 Pa. 79, 96 A. 135, and Adams, 69 Pa. Super. 478, 1918 WL 2272); accord Brief for Amicus Energy Association of Pennsylvania at 3-4 (contending that service-point demarcation "provides a considered, bright-line rule that has shaped utility companies' and consumers' conduct for generations" and advocating its continued longevity).

Duquesne Light explains that, on an annual basis, it must contend with many service outages precipitated by unpredictably inclement weather and other causes, requiring its personnel to work overtime, borrow workers from other companies, and strive to restore power for the public benefit as quickly as possible.  The electric company reiterates that the imposition of a burden to inspect customer equipment

---

[8] Duquesne does recognize that the Superior Court seems to have contemplated a duty to inspect the company's own meters located within the funeral home, as opposed to inspection of customer equipment or systems, but the electric company contends that its work crew simply had no reason to inspect the meters.  See Brief for Appellant at 13 (asserting that the report submitted by the electrical engineer retained by Hirsch "gave no reason to inspect the meters, identified no malfunction in the meters, and offered no opinion that the meters had anything to do with the fire").  According to the utility, the intermediate court thus "transformed Duquesne Light's right to inspect its own equipment into a duty to inspect the customer's equipment."  Id. at 14 (emphasis in original).

would require the involvement of licensed electricians and an expenditure of untold man-hours. Moreover, according to the utility, the duty recognized by the Superior Court is untenably indefinite in terms of what it is that an electric service provider needs to inspect, so that company personnel will be faced with the "impossible quandary" in determining how far they should go to examine customer electrical equipment and systems. Brief for Appellant at 8. Duquesne also emphasizes that inspections internal to private customer premises will engender substantial delays in restoration of power after outages. See id. at 22 ("If electric customers are suddenly required to endure longer power outages than before, this should be determined by the Public Utility Commission, not the Superior Court.").

As to Althaus, Duquesne Light posits that "[i]n announcing this summary of the factors comprising legal duty, surely this Court did not intend to wipe the slate clean of prior precedents and erase long-standing principles of Pennsylvania tort law." Brief for Appellant at 15. In the event this Court might deem the Althaus factors relevant, the electric company discusses these, again weaving in the concerns with increased costs, delays, and uncertainties. Furthermore, the utility highlights the social utility of electrical distribution, downplays the foreseeability of damage to a structure's internal electrical system resulting from a downed utility pole, and characterizes the consequences of a duty in the present case as tantamount to making electric service providers insurers of the safety of private electrical systems and equipment.

The PUC has filed an amicus brief supporting Duquesne Light's position. Like the electric company, the Commission couches the duty recognized by the Superior Court as one on the part of an electric service provider to "inspect customer equipment after storms and outages," thus also disregarding the warning aspect of the intermediate court's determination. Amicus Brief for the PUC at 4. As to the asserted duty to

inspect, the Commission supports the utility's position that its imposition is unprecedented and burdensome and urges this Court to reaffirm the longstanding service-point rule allocating ownership and maintenance responsibility for electrical systems in two directions from the point of delivery.

The PUC also offers a detailed overview of its regulatory responsibilities relative to electric service providers and its efforts to ensure speedy and efficient restoration of power after outages, in furtherance of the public interest. See, e.g., id. at 16 ("[I]mposing a duty on the electric utility to inspect customer wiring/equipment prior to service restoration after an outage is not only . . . cost prohibitive and not in the public interest, but also is beyond the utility's jurisdiction and responsibility."). Additionally, the Commission offers its own Althaus assessment, again emphasizing factors such as the public interest in prompt, efficient, safe, and affordable restoration of power in the wake of an outage. Finally, the PUC suggests that the imposition of duties upon utilities should be left to its regulatory province and not to the field of the common law. See id. at 27 ("[T]he Superior Court intruded on the PUC's statutory duty to regulate service duties of public utilities.").

The Energy Association of Pennsylvania also filed an amicus brief supporting Duquesne. Like the electric company and its regulator, the Energy Association discusses the Superior Court's determination solely in terms of a duty to inspect, to the exclusion of the court's alternative formulation of a duty to warn. In substantial tension with the opinion expressed in Mr. Wunderley's report, the Association's position is also premised on the notion that, at the time the line crew restored power to the funeral home, its members had no reason to believe there was a dangerous condition inside the premises. See, e.g., Brief for Amicus Energy Ass'n of Pa. at 2 ("This Court should reverse the Superior Court and clarify that Appellant Duquesne had no duty to inspect

inside Appellee's locked and unoccupied facility, after hours <u>and in the absence of any indication of heightened fire danger</u>, before restoring power." (emphasis added)).

In addition to reinforcing the legal arguments presented by Duquesne Light, the Energy Association observes that power outages themselves, especially prolonged ones, create their own dangers. <u>See id.</u> at 7 (discussing such risks as encompassing "downed, live wires to fires caused by candles, to hypothermia in the winter and heat stroke in the summer," as well as potential spoilage of refrigerated medication and idling of powered essential medical equipment, such as respirators). The Association envisions that imposing a duty to inspect on electric service providers would cause untenable delays in power restoration and result in enormous costs to Pennsylvania utility companies and consumers. <u>See id.</u> at 12.

For Hirsch's part, it did not escape its attention that the Superior Court envisioned a "duty . . . to inspect, or at a minimum, to warn[.]" Brief for Appellee at 4 (quoting <u>Alderwoods</u>, 52 A.3d at 355). In sharp contract to Duquesne Light's presentation and those of its <u>amici</u>, Hirsch returns regularly to the warnings issue throughout its brief.[9]

In terms of the duty to inspect, Hirsch takes issue with Duquesne Light's portrayal of the precedent as establishing that under no circumstances does a utility

---

[9] <u>See also id.</u> at 10 ("It is important to note that in its Opinion, the Superior Court found a duty to inspect <u>or</u> a duty to warn the customer." (emphasis in original)); <u>id.</u> at 14 ("At a minimum, the duty involves merely warning customers of possible overvoltage damage rather than inspecting."); <u>id.</u> at 22-23 ("Duquesne Light and its <u>amici</u> neglect to report that under the circumstances of this case, the [Superior Court's] opinion requires inspections <u>or warnings to the customers.</u>" (emphasis in original)); <u>id.</u> at 29 ("In the alternative, much as the power industry does after flooding events, Duquesne Light could simply have contacted Hirsch to warn that Duquesne Light suspected overvoltage damage and would not restore service to the building until the building's equipment was inspected by a third party.").

have such an obligation. According to the funeral business owner, the decisions simply did not contemplate scenarios involving utilities with actual or constructive notice of a dangerous condition on the customer side of a service point. See Brief for Appellee at 14 ("Implicit in each case is the notion of foreseeability – that an electric utility can be under no duty to inspect a customer's faulty equipment when the utility has no reason to anticipate the fault."). In this regard, Hirsch invokes the axiom that the holding of a judicial decision is to be read against the factual circumstances under review. See id. at 16 (quoting City of Pittsburgh v. WCAB (Robinson), 620 Pa. 345, 365, 67 A.3d 1194, 1206 (2013)). Further, it maintains that electric service providers, like all others, are subject to the duty of care not to harm others by their affirmative conduct, where such injury is reasonably foreseeable. See id. at 17-18 (citing Seebold, 618 Pa. at 654, 57 A.3d at 1246, and quoting Mirnek v. W. Penn Power Co., 279 Pa. 188, 191, 123 A. 769, 770 (1924), for the proposition that electric companies "are bound to anticipate . . . such combinations of circumstances and accidents and injuries therefrom as they may reasonably forecast as likely to happen").

Respecting Duquesne Light's and its amici's policy concerns about potential delay, expense, and hardship to utilities and the public at large, Hirsch regards them as "severely overblown." Brief for Appellee at 12; see also id. at 39 (positing that, particularly in light of the potential for fires to spread to other properties, "[t]he consequences of a fire caused by failing to inspect, or to warn of, a building with a suspected electrical fault dwarf those of delaying the restoration of service"). Against the present circumstances, the funeral business owner notes that an inspection would have encompassed only Hirsch's premises, since it was the sole building serviced directly by the demised utility pole and the only structure to have sustained direct damage, in the form of detached service lines. Further, Hirsch presents a discussion of

the Althaus factors along the lines of its submission to the common pleas court, as discussed previously.

Finally, responding to the position of Duquesne Light and its amici that there were no circumstances suggesting an unreasonable risk of harm to the funeral home when the work crew restored power, Hirsh relies on, inter alia, Mr. Wunderley's position to the opposite effect, based primarily on the condition of fallen and damaged lines at the crash site. See Brief for Appellee at 9, 53-54. Furthermore, the funeral business owner cites Summers v. Certainteed Corp., 606 Pa. 294, 997 A.2d 1152 (2010), as exemplifying the consideration to be given to expert opinion proffers in summary judgment inquiries. See id. at 309, 997 A.2d at 1161 ("It has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact, here, a jury.").

## III. Discussion

At the outset, we agree with the legal position of Duquesne Light and its amici that, under Pennsylvania law, maintenance and inspection responsibilities generally are divided at the service point, such that an electric service provider does not have a freestanding duty to inspect customer-owned electrical equipment and services on the premises' side. Accord Milton, 251 Pa. at 83, 96 A. at 136. As amply reflected above, however, the Superior Court simply did not recognize such a freestanding obligation. Rather, the obligation envisioned by the intermediate court expressly encompassed an alternative entailing the more modest avenue of warning a customer proximate to downed lines prior to restoring power after an outage, where the utility has actual or

constructive notice of a dangerous condition within the customer's premises. Alderwoods, 52 A.3d at 355.[10]

Part of the conceptual difficulty in this case lies in the litigants' very different approaches to the legal issues presented. As noted, Duquesne Light prefers to confine the discussion as closely as possible to the service-point rule; whereas, in Hirsch's estimation, the dispute more appropriately centers upon application of the common-law duty to take reasonable measures to avert harm occasioned by one's own conduct, in the face of actual or constructive knowledge of a danger. As the funeral business owner observes, the obligation it relies upon is reflected, in general terms, in Section 302 of the Restatement Second of Torts and the associated commentary. See Restatement (Second) of Torts §302 cmt. a.

In this regard, we find that the service-point rule has its limits and does not wholly supplant the salient common-law duty. As Hirsch develops amply, the service-point principle evolved in scenarios in which the courts were not focused on the presence of actual or constructive knowledge, on the part of utilities engaged in affirmative activities proximate to customer premises, of an unreasonable risk of harm arising from their conduct.[11] Indeed, although Duquesne Light would clearly like to enjoy immunity from

---

[10] The warnings option obviously mitigates the specter of broken-down doors and unauthorized trespass alluded to in various of Duquesne's submissions. Moreover, whereas the PUC observes, pointedly, that "Duquesne is Hirsch's electric utility; however, Duquesne is not Hirsch's electrician," Brief for Amicus the PUC at 19, the observation takes on a much different color if the electric company had actual or constructive knowledge of an unreasonable risk to the funeral home tied to power restoration and did not notify Hirsh so that it, in turn, could summon its electrician.

[11] While Duquesne Light and the dissenting opinion authored by Mr. Justice Eakin invoke the Milton line of decisions, they point to no statement or developed reasoning appearing in that opinion or any other Pennsylvania case reflecting an informed, judicial holding that the general service-point demarcation obviates the common-law duty to take reasonable measures to avert harm to others occasioned by one's own conduct in (continued...)

tort liability per a broad-scale application of the service-point rule, the electric company has itself refrained from stating, outright, that it is exempt from the application of the general tort-law duty to take reasonable measures to avert an unreasonable risk of harm to others occasioned by its own conduct.[12]

Duquesne Light's treatment of the underlying duty dovetails with its approach to the warning aspect – quite simply, the electric company fails to deal squarely with either. Based on such a deficient presentation, we have no intention of exempting a company administering in a dangerous commodity from well-recognized duties of care,

---

(…continued)
the face of actual or constructive knowledge of an unreasonable risk. Indeed, the Superior Court in Adams apprehended that this question simply is not addressed through application of the general service-point rule as articulated in Milton. See Adams, 69 Pa. Super. at 486, 1918 WL 2272, at *4 ("It may be that an electric company should be held responsible for injuries to third parties caused by defective wiring of a building if it continued to furnish current after knowledge of the defect in the wiring, but that question we are not here called upon to decide."). In this regard, moreover, Hirsch aptly references the principle that the holdings of the decisions must be read against their facts. See, e.g., Maloney v. Valley Med. Facilities, Inc., 603 Pa. 399, 411, 984 A.2d 478, 485-86 (2009).

Parenthetically, given that the Adams court cautioned that its opinion (and implicitly Milton, upon which Adams relied) should not be read to insulate electric companies from the common-law duty in issue, the dissent's basis for citing Adams as supporting the contrary proposition is unclear. See Dissenting Opinion, slip op. at 1-2 (Eakin, J.).

[12] For example, as previously observed, when addressing Hirsch's efforts to invoke the common-law duty, the electric company rests its disclaimer on the position that there is no factual basis to support its application, then transitions immediately back to its discussion of the service-point rule. See Reply Brief for Appellant at 2-3. Nowhere in its submissions does the utility specifically deny that an electric service provider, on actual or constructive notice of a dangerous condition of electrical equipment inside a customer's premises proximate to downed wires, should refrain from restoring power, at least pending the undertaking of reasonable efforts to notify an affected customer.

in the face of actual or constructive knowledge of a danger.[13]  Moreover, the undertaking of reasonable efforts to avert harm prior to restoring power -- at least some form of warning as envisioned by the Superior Court -- represents a relatively modest measure in the face of an unreasonable risk of which a utility knows or should be aware.

We acknowledge the large-scale, indispensable public benefit administered by electric service providers, as well as the many challenges they face which are inherent in the daunting task of maintaining twenty-four-hour service over a large geographic area.  In light of this value and responsibility and scale, it may well be that, upon a full and developed consideration of the landscape of the mixed policy considerations involved, such companies should enjoy some degree relief from exposure to the expense and uncertainties inherent in tort litigation and attendant jury determinations (by a preponderance of the evidence) concerning whether they have met their duties at common law in discrete scenarios as they may arise.  We have recently explained, however, that such matters of immunity generally are best decided by the political branch, since the General Assembly is better positioned to make informed policymaking judgments reflecting an appropriate balancing among the respective interests involved. See Lance v. Wyeth, ___ Pa. ___, ___, 85 A.3d 434, 454 (2014) ("[B]ecause the Legislature possesses superior policymaking tools and resources and serves as the political branch, we [have taken] the position . . . that we would not direct the substantive common law away from well-established general norms in the absence of some clear predominance of policy justifications."); see also Seebold, 618 Pa. at 653,

---

[13] The PUC's position that we should leave this matter to its regulatory province is entirely detached from the summary judgment motion Duquesne Light filed and the limited review which was granted by this Court.  As such, in the present context, we decline to consider the Commission's ability to diminish general common-law duties on the part of utilities.

57 A.3d at 1245. Moreover, we have reaffirmed that the treatment of these sorts of policy arguments should be on a developed record, including empirical information, which would support an informed, legislative-type judgment -- subject, of course, to constitutional limitations. See Lance, ___ Pa. at ___, 85 A.3d at 454.

It is therefore material that Duquesne Light never set out, in its summary judgment effort, to establish such a record or case. Rather, its position from the outset has been premised on the assumption that the longstanding service-point rule represents the be-all-and-end-all of an electric utility's obligations touching upon the customer side of the service point. Accordingly, our resolution of the present appeal begins and ends with the above response to this question as framed.[14]

---

[14] We note that many of amici's broader-scale policy arguments must fall by the wayside, in light of Duquesne's failure to pursue a full-scale public-policy assessment from the outset. Moreover, to the degree that the Superior Court's Althaus assessment appears to be abstract, conclusory, and debatable, this would seem to be attributable, at least in part, to the absence of a concrete record-based foundation to support an informed treatment of substantially mixed public policy considerations.

Parenthetically in considering this litigation from an overview perspective, we do recognize there are fairness concerns on both sides. For example, on the one hand, Hirsch did not specifically focus its pleadings and submissions in the common pleas court on warnings, and, indeed, it has not sought to amend the complaint although it has pursued a substituted theory of liability resting on different factual premises. Furthermore, Mr. Wunderley's opinion about the probability of an overvoltage event is stated in somewhat conclusory terms, with nothing empirical to bolster his assessment as to the degree of likelihood.

On the other hand, Duquesne Light did not style its challenge as one to the sufficiency of the complaint, nor did it lodge an attack on the validity of Mr. Wunderley's opinion in terms of methodology or the adequacy of the factual premises he employed. Additionally, by virtue of its one-dimensional focus on a duty to inspect, the electric company seems to have simply ignored the complaint's broader assertion of an obligation "to do those things which were necessary to preserve Hirsch's property and render [the funeral home] safe in the process of reconnecting [it] to the high-voltage line." Alderwoods, 52 A.3d at 355 (citing Amended Complaint in Alderwoods at ¶18). (continued…)

As to the aspects of this litigation centered on the <u>Althaus</u> factors, we find these to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario. Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application. To the extent that Hirsch wishes to pursue a theory at trial that a warning would have represented a reasonable measure to avert harm in the circumstances presented, nothing appropriately raised in this appeal would prevent it from doing so.[15]

---

(…continued)

Contrary to the position advanced by way of dissent, our decision today is not that such catch-all language subsumes a warning. <u>See</u> Dissenting Opinion, <u>slip</u> <u>op.</u> at 6-7 (Eakin, J.). Rather, it is that Duquesne Light, as the appellant (and thus the litigant responsible for the framing of the questions presented to this Court) has in no way fashioned its own appeal in a manner which would allow for reasonable resolution of the issue at this time. <u>Accord</u> <u>supra</u> note 2.

[15] In dissent, Madame Justice Todd emphasizes that the issues on which appeal was allowed do not directly encompass the warnings aspect; she attributes fault for such circumstance to this Court; and she advocates soliciting additional briefing on the warnings issue. <u>See</u> Dissenting Opinion, <u>slip</u> <u>op.</u> at 2-3 (Todd, J.).

The allocatur grant issues, however, were taken verbatim from Duquesne Light's own petition for allowance of appeal. <u>See</u> <u>Alderwoods,</u> 620 Pa. 214, 66 A.3d 763 (2013) (<u>per</u> <u>curiam</u>) ("The issues, <u>as stated by Petitioner,</u> are . . . (emphasis added)). As we have discussed above, Duquesne seeks a full-scale reversal of the Superior Court's ruling; the company obviously cannot be fairly surprised to see that this Court would engage in some treatment of such ruling on its actual terms. Along these lines, moreover, although we certainly would be constrained in our ability to <u>reverse</u> based on decisional aspects downplayed or overlooked by an appellant, <u>see, e.g.,</u> <u>Konidaris v. Portnoff Law Assocs., Ltd.,</u> 598 Pa. 55, 63-64 n.8, 953 A.2d 1231, 1235 n.8 (2008) – which is a jurisprudential limitation that Justice Todd does not discuss in her proposal – an appellate court may <u>affirm</u> for any reason appearing as of record, <u>see, e.g.,</u> (continued…)

For the sake of a rounder treatment of the arguments presented, we emphasize that Duquesne Light's and its amici's argumentation that the electric company lacked constructive notice of a dangerous condition inside the funeral home conflicts squarely with the expert opinion of Mr. Wunderley presented by Hirsch. In light of such a conflict, the utility cannot merely rest upon recitations of evidence supportive of its own position, since such differences present questions for a finder of fact and not a judge attending to a summary judgment motion. See Summers, 606 Pa. at 309-10, 997 A.2d at 1161. Furthermore, we will not consider, at a second-tier appellate-review stage, indirect attacks on Mr. Wunderley's opinion posed as an after-thought to Duquesne's advancement of its position that the service-point rule controls in all events. Rather, to challenge the engineer's opinion, in one fashion or another, Duquesne must deal more directly with the substance of Mr. Wunderley's reports on their salient terms. Cf. PennDOT v. Patton, 546 Pa. 562, 569, 686 A.2d 1302, 1305-06 (1997) ("The question of constructive notice was a major issue in this case, and there was substantial conflicting evidence on the issue. It was therefore not a question to be decided by the court[.]").[16]

---

(…continued)
Commonwealth v. Moore, 594 Pa. 619, 638, 937 A.2d 1062, 1073 (2007). This is precisely our approach here.

We have also attempted to be conservative in terms of our discussion of the warnings matter. We do not foreclose the possibility that electric utilities might be treated differently from the wide range of entities and persons who are bound by the general duty not to create unreasonable risks of harm to others through affirmative conduct. We merely reiterate that no legal authority has been presented in this appeal to suggest that electric companies, in fact, presently enjoy such an exemption.

[16] This Court has no idea how likely it is, when mixed-voltage utility lines fall proximate to a structure, that a power surge may impact the building's electrical system. Certainly, the probability may depend upon such factors as the position of the lines on the ground (continued…)

Finally, responding to Justice Eakin's position, the dissent is grounded on the notion that the Milton decision wholly relieved electric companies from the general common-law duty to take reasonable measures to avoid harming others through one's own affirmative conduct undertaken with actual or constructive knowledge of an unreasonable risk. As we strongly differ with such premise, see, e.g., supra note 11, we disagree just as firmly with the dissent's repeated assertion that our present opinion imposes a "new duty." Dissenting Opinion, slip op. at 3-4 (Eakin, J.).[17] While the

_____

(…continued)
and the general efficacy of controls interposed in the electrical infrastructure, such as control switches and circuit breakers. See, e.g., 17 AM. JUR. PROOF OF FACTS 2D §643 (2014) (explaining that "[i]n view of the great destructive capabilities of electricity, it is to be expected that many controls would be imposed on distributors" and "[p]ole-top automatic switches and automatic circuit breakers have been in practical use since 1912"). According to Mr. Wunderley's report, however, the engineer considers a surge to be a materially likely outcome, and Duquesne Light's summary judgment effort simply was not orchestrated in a fashion which would reasonably put counter-considerations into play. The result is that the electric company and its amici have been relegated to countering Mr. Wunderley's opinion through mere denials in legal briefs (albeit premised in part on statements by Duquesne's own employees).

[17] This dissent also appears to regard the process of assessing the scope of common-law duties as a vehicle to render case-specific pronouncements of discrete obligations owed solely by particular litigants and applicable only in specific cases. See Dissenting Opinion, slip op. at 3 (Eakin, J.). To the contrary, however, common-law duties generally are stated in broad terms to apply to classes of cases, accord Seebold, 618 Pa. at 654, 57 A.3d at 1246, and ongoing expansions and contractions are to be carefully considered on a developed, legislative-type record capable of supporting the essential policy-based judgments, see id. at 658 & n.24, 57 A.3d at 1248. The notion of an unwieldy process of perpetual, case-specific, common-law pronouncements is antithetical to the nature of the undertaking. Rather, generally, courts establish the landscape of common-law duties as a matter of law, and juries decide, in individualized circumstances presented and where there are material facts in dispute, whether such duties have been breached. Accord Cabral v. Ralphs Grocery Co., 248 P.3d 1170, 1176 (Cal. 2011) (explaining that the legal duty determination centers on categories of negligent conduct, not the particular parties in narrowly-circumscribed sets of facts, and commenting that, "to base a duty ruling on the detailed facts of a case risks usurping the (continued…)

dissent offers various inquiries about what actions Duquesne Light might have taken which would be considered reasonable under the circumstances, see id. at 4, these are precisely the sorts of considerations relegated to juries in cases in which a common-law duty exists and there are material factual questions concerning whether such obligation has been met. See supra note 17.

### IV. Summary

Since Duquesne Light has failed to adequately confront the common-law duties invoked by Hirsh or the warnings dynamic tempering the Superior Court's ruling, we have little basis to assess whether the electric company might be accorded immunity from such duties, or whether a requirement to warn might be unreasonable. Against such background, we hold that the Superior Court did not err to the extent that it recognized a duty, on the part of an electric service provider, to take reasonable measures to avert harm in a scenario in which the utility has actual or constructive knowledge of a dangerous condition impacting a customer's electrical system, occasioned by fallen and intermixed electrical lines proximate to the customer's premises. Furthermore, we offer no opinion as to whether Duquesne Light had actual or constructive knowledge of an unreasonable risk in the present scenario, since the electric company's summary judgment effort was not staged in a fashion which would elicit an informed determination on such point.

Electric service providers are not insurers relative to the safety of their customers' equipment, and subjugation to basic, common-law duties of care simply

---

(…continued)
jury's proper function of deciding what reasonable prudence dictates under those particular circumstances.").

does not make them so.[18]  To the extent they may seek relief from such obligations and immunity from conventional tort liability outside the sphere of existing judicial decisions, their arguments are best presented to the political branch.

The order of the Superior Court is affirmed, albeit we find the intermediate court's Althaus assessment to have been unnecessary and express no opinion as to its sufficiency or merits.

Former Justice McCaffery did not participate in the decision of this case.

Mr. Chief Justice Castille and Messrs. Justice Baer and Stevens join the opinion.

Mr. Justice Eakin files a dissenting opinion.

Madame Justice Todd files a dissenting opinion.

---

[18] Rather, for better or for worse, and in the absence of considered, affirmative immunities, utilities are merely regulated to the exposure and uncertainty facing other entities and persons within our existing system of civil justice as it subsumes the range of common-law duties.