J-A31012-14

2015 PA Super 95

| GEISINGER CLINIC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| MARK M. RADZIEWICZ, D.O. | |
| Appellee | No. 505 MDA 2014 |

Appeal from the Order Entered February 24, 2014
In the Court of Common Pleas of Montour County
Civil Division at No(s): 449-2013

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

DISSENTING OPINION BY OTT, J.:                **FILED APRIL 24, 2015**

Because I believe that the certified record demonstrates the trial court based its decision on actual, not merely apparently, reasonable grounds, I would affirm the denial of the preliminary and permanent injunction that Geisinger Clinic sought against Mark M. Radziewicz, D.O.  Accordingly, I respectfully dissent.

Our scope of review "on an appeal from a decree either granting or denying a preliminary injunction is to examine the record *only* to determine if there were *any apparently reasonable grounds* for the action of the court below."  **Bryant v. Sling Testing**, 369 A.2d 1164, 1167 (Pa. 1977) *quoting* **Lindenfelser v. Lindenfelser**, 123 A.2d 626 (Pa. 1956) (emphasis added).

> Further,
> Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. **Bettinger v. Carl Berke**

***Associates, Inc***., 455 Pa. 100, 314 A.2d 296 (1974); ***Reading Aviation Service Co. v. Berolet***, 454 Pa. 488, 311 A.2d 628 (1973). However, where the covenant imposes restrictions broader than necessary to protect the employer, we have repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer, ***Jacobson & Co. v. International Environment Corp.***, 427 Pa. 439, 235 A.2d 612 (1967) (unanimous).

***Sidco Paper Company v. Aaron***, 351 A.2d 250 (Pa. 1976) (further citation omitted)[1].

There are six elements that must be established in order to obtain a preliminary injunction. Accordingly, the failure to establish any of the six elements requires the trial court to deny the injunction. ***Gati v. University of Pittsburgh***, 91 A.3d 723, 729 (Pa. 2014). The six elements are:

First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth, and finally, the party seeking an

---

[1] Following the ***Jacobson v. International*** citation, our Supreme Court cited an additional 10 Pennsylvania Supreme Court decisions supporting the limitation on employee covenants.

injunction must show that a preliminary injunction will not adversely affect the public interest.

*Id*. at 728.

Instantly, the trial court determined Geisinger had failed to meet elements one, two and four. The trial court came to this conclusion because,

> all of [Geisinger's] arguments require an acceptance of the credibility of the testimony of [Geisinger's] witnesses and assume that their testimony is fact. That is not the case, and [Geisinger's] witnesses were deemed to overstate, exaggerate and misstate the impact of [Dr. Radziewicz's] alleged violation of the restrictive covenant at issue, [Dr. Radziewicz's] role as a hospitalist at Wilkes-Barre General Hospital [WBGH], and the allegation that [Dr. Radziewicz] "competes" with [Geisinger] as a hospitalist at Wilkes-Barre General Hospital (it has been deemed that he does not compete with [Geisinger] as a hospitalist at Wilkes-Barre General Hospital).

Trial Court Opinion, 5/21/2014, at 2.

The trial court's determinations were based upon its credibility determinations, and, where "the evidentiary record supports the trial court's credibility determination; we are bound to accept them." *Samuel-Bassett v. Kia Motors of America, Inc.*, 34 A.3d 1, 32 (Pa. 2011). Accordingly, if the trial court's credibility determinations are supportable, those determinations would provide actual, not merely apparently, reasonable grounds, for the denial of the injunction.[2] Therefore, I examine the record before the trial court.

_____

[2] The majority has correctly noted, "[b]ecause contract interpretation is a question of law, this Court is not bound by the trial court's interpretation." Majority at 8, n.2 (citations omitted). We are not instantly interpreting the

*(Footnote Continued Next Page)*

To understand the trial court's ruling, one must understand Dr. Radziewicz's duties with both Geisinger and Advanced Inpatient Medicine (AIM).[3] Dr. Radziewicz was employed by Geisinger for approximately 14 years as a primary care physician (PCP) specializing in family practice. Dr. Radziewicz was board certified in family practice prior to his employment with Geisinger. *See* N.T. Hearing, 12/17/2103 at 38. A PCP cares for the patient from all ages from pediatrics to geriatrics, throughout the span of life. *Id*., at 39. By definition, a PCP represents an ongoing relationship, potentially for decades, with each patient in the physician's practice. The evidence presented at the hearing demonstrated that Geisinger spent in excess of $65,000.00 during the 14 years of Dr. Radziewicz's employment supporting, training, and helping to develop the Doctor's practice. *Id*. at 78.

*(Footnote Continued)* _____

language of restrictive covenant. Dr. Radziewicz does not challenge the fact that he was practicing within the restricted area. The main question before the trial court was whether Geisinger was harmed by that fact. The law is clear that if a party cannot demonstrate "immediate and irreparable harm that cannot be adequately compensated by damages", that party is not entitled to injunctive relief. The determination of harm is not a question of contract interpretation; it is a question of fact. To that end, Geisinger was required to prove each of the six elements described in *Gati*, *supra*. The trial court based its factual determinations regarding harm upon its credibility determinations. Accordingly, I believe the trial court's credibility determinations are both salient and binding. If the only question to be answered was whether Dr. Radziewicz opened his practice within the restricted area in contravention to the employment contract, there would have been no need to provide evidence regarding the six elements.

[3] Dr. Radziewicz is employed by AIM, which has a contract with WBGH to provide doctors to the hospital who perform the duties of a hospitalist.

The evidence further demonstrated that Dr. Radziewicz had approximately 5,400 patient contacts per year in his practice with Geisinger. *Id*. at 88.

On the other hand, a hospitalist, which is Dr. Radziewicz's present position at WBGH, does not have his or her own independent practice. Rather, the hospitalist is a doctor who works solely within a hospital, seeing patients who otherwise do not have an attending physician. *Id*. at 51-52. A hospitalist sees patients in one of three ways. First, when the patient enters the emergency room, requires inpatient care and either does not have a PCP or the PCP does not have hospital privileges, then the hospitalist will attend to the patient. Second, if the patient is in the hospital for another reason, such as surgery, and in the course of surgical after care, other treatment is needed. Finally, a patient can be admitted to the hospital by the PCP, but for whatever reason the PCP does not go the hospital. The hospitalist will then care for the patient. The primary mission of the hospitalist is to treat the patient while an inpatient and return the patient to the care of the PCP after discharge. Essentially, a hospitalist is a safety net provided by the hospital to make sure all inpatients have attending physicians, when those patients do not otherwise have a PCP or attending physician. *Id*. at 54.

Specifically, regarding AIM and WBGH, AIM provides WBGH five hospitalists who work shifts. N.T. Hearing, 2/12/2014, at 20. A patient can request to be seen by a specific hospitalist, but the request can only be honored if that hospitalist is currently on shift. N.T. Hearing 12/17/2013, at 56. Hospitalists do not have a practice that includes a caseload of patients;

specifically, Dr. Radziewicz does not practice family medicine or work as a primary care physician. N.T. Hearing, 2/12/2014, at six. Patients are not recruited by either AIM or an individual hospitalist. Individual hospitalists are not advertised by AIM nor are they allowed to advertise. *Id*. at 9-10.

Dr. Steven Pierdon, the executive vice-president chief medical officer for Geisinger testified to the harm Geisinger would suffer when other PCPs, knowing Dr. Radziewicz was a hospitalist with WBGH, started referring patients to WBGH because of Dr. Radziewicz's association with that hospital. N.T. Hearing, 12/17/2013, at 76. Dr. Pierdon testified other PCPs would refer patients to WBGH, presumably rather than the Geisinger hospital, because of Dr. Radziewicz's reputation as a Geisinger trained physician. *Id*. Further, he testified that in addition to direct losses that might be attributable to Dr. Radziewicz's practice of medicine contrary to the restrictive covenant, disruptions in the local Geisinger practices might occur. Specifically, Dr. Pierdon testified:

> If they're leaving outside of the market, it is less likely that patients will leave and follow that physician so you have a need to get a physician in there that you can rapidly fill and justify their cost and expense as opposed to if they set up within the area and the patients shift market.

N.T. Hearing, 12/17/2013, at 117.[4]

---

[4] While Dr. Pierdon's testimony is not absolutely clear, he appears to suggest that if a doctor leaves the Geisinger practice and begins practicing in the local area, that doctor's patients are likely to follow, thereby costing Geisinger time, effort, and money to rebuild the practice.

However, in the nine weeks Dr. Radziewicz worked at WBGH prior to the hearing, Geisinger identified one Geisinger patient treated by Dr. Radziewicz. N.T. Hearing, 12/17/2013, at 90. That patient was brought to WBGH for emergency treatment and was admitted to the hospital on the recommendation of the ER physician. *Id*. at 94. Essentially, Geisinger admitted treatment by Dr. Radziewicz was nothing more than happenstance; there was no evidence or suggestion that the patient sought care at WBGH for any reason connected with Dr. Radziewicz. Nor was there any evidence that the patient terminated her association with Geisinger following her treatment by Dr. Radziewicz.

Because Geisinger's request for injunctive relief must fail if any of the six required elements are not proven, I need only to analyze the trial court's conclusion that Geisinger failed to demonstrate it was subject to "immediate and irreparable harm that cannot be adequately compensated by money damages." *Gati v. University of Pittsburgh*, *supra*. In determining such harm, case law also dictates that:

> It is not necessarily the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.

*Quaker City Engine Rebuilders, Inc. v. Toscano*, 535 A.2d 1083, 1085 (Pa. Super. 1987).

Regarding harm, the trial court opined:

[T]here was significant testimony at the hearing on the issue of whether [Dr. Radziewicz] is competing with [Geisinger], which, in turn, bears upon the element of whether [Geisinger] stands to suffer irreparable harm if a preliminary injunction is not issued pending trial on the merits of a final injunction. If [Dr. Radziewicz] is not competing with [Geisinger], he is not causing any harm to [Geisinger]. Certainly, [Geisinger] presented testimony at the hearing from various witnesses testifying to the alleged great investment which [Geisinger] made to allegedly develop [Dr. Radziewicz's] skills as a physician and [Geisinger] made tenuous claims that [Dr. Radziewicz] was competing with [Geisinger] in his role as a hospitalist at Wilkes-Barre General Hospital. Considerations in deeming [Geisinger] to have failed to prove the element of the presence of irreparable harm are as follows: (a) The claims presented by [Geisinger] that [Dr. Radziewicz] is harming [Geisinger] due to the alleged great expense incurred by [Geisinger] in training [Dr. Radziewicz] are not accepted as credible. According to [Dr. Radziewicz's] testimony, which is accepted as credible, he attended medical school and underwent his residency training well before he signed the restrictive covenant agreement with [Geisinger], and that is deemed to be the lion's share of contribution to [Dr. Radziewicz's] present skills as a physician; (b) If [Geisinger] expended efforts and expense on [Dr. Radziewicz's] training, that money has already been spent, and withholding a preliminary injunction does not add any expense or harm to [Geisinger]; and (c) [Dr. Radziewicz's] testimony that he is a hospitalist who does not recruit patients, and whose patients are either admitted involuntarily through the emergency room, or by other primary physicians over whom he has no control, is accepted as credible. [Dr. Radziewicz's] medical practice, therefore, does not attract patients away from [Geisinger's] practice group, and does not compete with, or harm, [Geisinger's] business.

Trial Court Opinion, 5/21/2014, at 3-4.

Of these three factors, the third is clearly the most significant. The first two address Geisinger expenditures made throughout Dr. Radziewicz's

tenure as a Geisinger employee. As the trial court noted in (b), these funds[5] cannot be recouped by means of an injunction. It is the third aspect that provides the possibility of ongoing irreparable harm.

Despite Geisinger's fears that Dr. Radziewicz practicing as a hospitalist at WBGH would draw patients from Geisinger's practice, thereby representing the "unbridled continuation of the violation" of the covenant, producing the "resultant incalculable damage to Geisinger", *see Quaker City v. Toscano*, *supra*, Geisinger could document a single instance in which Dr. Radziewicz treated a Geisinger patient. However, there was no evidence to indicate the patient opted for the emergency room associated with Dr. Radziewicz or otherwise left Geisinger's practice.[6] Geisinger

---

[5] Although factor (b) only specifically mentions money spent training Dr. Radziewicz, the same is true of any money spent advertising Dr. Radziewicz's medial practice. An injunction today does not affect Geisinger's prior expenditures in any way. Therefore, an injunction does not prevent any further harm to Geisinger in terms of these expenditures. Further, Dr. Radziewicz did not voluntarily leave Geisinger's employ, he was terminated. Therefore, Geisinger knowingly and voluntarily incurred whatever loss it suffered in training Dr. Radziewicz and in advertising his practice. Any such costs are unrelated to where Dr. Radziewicz currently practices medicine. Accordingly, the trial court's ruling on these elements is based upon apparently reasonable grounds.

[6] In *Quaker City v. Toscano*, *supra*, a sales representative left Quaker City and continued to use Quaker City's customer list to solicit business. There was evidence that 95% of 200 customers questioned had been approached by Toscano. Here, as a Geisinger employed physician, Dr. Radziewicz met with an undisclosed number of patients approximately 5,400 times per year. After leaving Geisinger's employ, he treated one, unsolicited patient in nine weeks. I cannot accept this as evidence of an "unbridled continuation" of harm to Geisinger.

presented no evidence regarding Dr. Radziewicz's personal reputation as a physician; therefore it would be pure speculation that any independent PCP would send a patient to WBGH because Dr. Radziewicz was one of a group of five hospitalists. Further, if it is the Geisinger training that is at issue, not Dr. Radziewicz's personal reputation, it is not logical that a referring physician would send a patient to WBGH, where one of five hospitalists are Geisinger trained, rather than to the nearby Geisinger hospital, where presumably all hospitalists are Geisinger trained. Accordingly, the trial court determination that Geisinger was not subject to immediate and irreparable harm is based upon apparently reasonable grounds. Under the same analysis, any claim of ongoing or potential damages is illusory.[7]

I also note that before a party is entitled to the imposition of an injunction, it must also prove that whatever harm it is seeking to prevent "cannot be adequately compensated by damages." *Gati v. Univ. of Pittsburgh*, *supra*. The final paragraph of the non-compete covenant, written by Geisinger, contains a liquidated damages provision. Specifically,

> I further understand that *Penn State Geisinger Clinic will waive this restriction* upon receipt of payment, in advance, of a sum equal to the greater of (a) my annualized base salary as of the date of this Agreement; or (b) my total compensation paid by

---

[7] In footnote 3, the majority expressed its concern regarding the potential consequences of the breach and opined I had taken a position contrary to recited law, citing only page 7 of my dissent. I stand by my analysis on pages 7 through 10 that Geisinger had failed to produce anything other than speculation to support a claim of ongoing and potential consequences.

Penn State Geisinger Clinic during the twelve calendar months immediately preceding the month in which my termination occurs, if I wish to continue my practice within the restricted area during the two years following my termination. Because the financial burdens Penn State Geisinger Clinic would endure are very difficult to ascertain and quantify, I agree that this is a fair amount of compensation to pay, as *liquidated damages*, not as a penalty, in the event that I wish to continue my practice within the restricted area within the two year period.

Penn State Geisinger Clinic-Physician Network Practice Agreement, 1/8/1998 (emphasis added).

Although by seeking an injunction, Geisinger is claiming the harm suffered cannot be adequately compensated by damages, Geisinger itself had arguably set determinable damages that would fairly compensate it in the event Dr. Radziewicz opened a medical practice in the restricted area.[8] Accordingly, Geisinger's harm, if in fact it suffered any, has been set by contract. The majority expresses doubt that this clause operates as a liquidated damages clause. However, Geisinger, which drafted the contract, expressly labeled it as regarding liquidated damages. Based upon Geisinger's own representation, I do not believe such doubts are warranted.[9]

_____

[8] The majority notes this issue was not raised below. It is a well-settled point of law that a decision affirming the trial court may be based upon any evidence of record. **Alderwoods (Pennsylvania), Inc., v. Duquesne Light Co.**, 106 A.3d 27, 41 n.15 (Pa. 2014).

[9] Even if one does not specifically label it as a liquidated damages clause, the fact remains that Geisinger agreed to a specific sum it would accept to waive the restrictive covenant.

The majority also notes that a liquidated damages clause does not bar specific performance of a contract unless the language of the agreement expresses that clear intent. Majority at 12. As quoted by the majority and recited above, the liquidated damages clause expressly waives the enforcement of the restrictive covenant upon payment of the damages indicated. I believe this specific waiver of the restrictive covenant expresses the clear intent to waive the restrictive covenant. Therefore, in addition to the other reasons why Geisinger is not entitled to injunctive relief, pursuant to Geisinger's own terms, the harm can be adequately compensated by monetary damages.[10]

There is no evidence of immediate harm, there is only speculation of ongoing harm, and any concern about "unbridled continuation" of harm to Geisinger is unsupported. Therefore, Geisinger cannot prevail and is not entitled to injunctive relief. Even if Geisinger could demonstrate harm, Geisinger itself has set the upper limit of damages. Once again, this prevents Geisinger from obtaining the injunctive relief it seeks.

---

[10] The trial court made a similar determination, stating Geisinger was unlikely to prevail on the merits because it was simultaneously pursuing an action at law in Luzerne County, seeking monetary damages. Because there is nothing in the record to confirm this statement, we cannot accept this explanation as a reasonable ground for denying the preliminary injunction. Regardless, the liquidated damages clause allows for specific monetary damages, just as an action at law.

The trial court has properly determined that Geisinger has not suffered immediate and irreparable harm, and even if such harm could be demonstrated, it can be adequately compensated by damages. Therefore, I believe the denial of Geisinger's request for injunctive relief should be affirmed. Accordingly, I respectfully dissent.